08 CV 01515

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

TRUSTEES OF THE POLICE AND FIRE
RETIREMENT SYSTEM OF THE CITY OF
DETROIT, Derivatively On Behalf of MBIA INC.,

                              Plaintiffs,

              -against-

DAVID C. CLAPP, GARY C. DUNTON, CLAIRE
L. GAUDIANI, DANIEL P. KEARNEY,
LAURENCE MEYER, DAVID M. MOFFETT,
DEBRA J. PERRY, JOHN A. ROLLS, RICHARD
C. VAUGHAN, RICHARD H. WALKER,
JEFFREY W. YABUKI,

                             Defendants,

              -and-

MBIA INC.

                     Nominal Defendant.

---

Civil Action No. _____

**VERIFIED DERIVATIVE
COMPLAINT**



Plaintiff Trustees of the Police and Fire Retirement System of the City of Detroit, by its

attorneys, alleges upon personal knowledge as to its own acts and upon information and belief as

to all other matters, based upon the investigation conducted by counsel which included, *inter*

*alia*, a review of Securities and Exchange Commission ("SEC") filings, news reports, analyst

reports, press releases, and other publicly available documents, as follows:

## SUMMARY OF THE ACTION

1.     This action is brought derivatively on behalf of nominal defendant MBIA Inc.

("MBIA" or the "Company") against certain directors and officers of MBIA for: (i) breaches of

fiduciary duty for failing to properly oversee and/or implement policies, procedures, and rules to

ensure compliance with federal and state laws requiring the dissemination of accurate financial

statements, and restricting the misuse of material, non-public corporate information concerning MBIA's common stock ("MBIA Stock" or "Company Stock"); and (ii) causing the Company to be sued for, and exposed to liability for violations of, *inter alia*, the Securities Exchange Act of 1934 (the "Exchange Act"), as well as causing it to be a target of investigations by the SEC, New York Insurance Department and Massachusetts Secretary of State.

2.      The relevant time period herein is from February 9, 2006 through the present (the "Relevant Time Period").

3.      MBIA is recognized as the world's largest bond insurer, providing, *inter alia*, financial guarantee insurance and other forms of credit protection to public finance and structured finance issuers, investors and capital market participants on a global basis. Its primary business is credit enhancement of municipal bond transactions sold in the new issue and secondary markets.

4.      MBIA conducts the financial guarantee business through its wholly owned subsidiary MBIA Insurance Corporation (referred to collectively with MBIA Inc. as "MBIA" or the "Company").

5.      The Company's financial strength, underwriting performance and record of service are reflected in the AAA rating of its claims-paying resources. Indeed, the Company's annual reports have long touted that "MBIA Corp. has triple-A financial strength ratings from Standard and Poor's Corporation ('S&P'), which the Association received in 1974; from Moody's Investors Service, Inc. ('Moody's'), which the Association received in 1984; from Fitch, Inc. ('Fitch'), which MBIA Corp. received in 1995; and from Rating and Investment Information, Inc. ('RII'), which MBIA Corp. received in 1998."

2

6.      Thus, the Company's AAA ratings are its product, competitive advantage and life-blood.  Recognizing this importance, MBIA knows that any reduction of its AAA ratings "could have a material adverse effect on its ability to compete and could also have a material adverse effect on the business, operations and financial results of the Company."

7.      Since its founding in 1974, MBIA specialized in providing financial guarantee insurance for conservative municipal bonds issuances.  As a consequence of that specialty, the Company maintained historically low loss reserves.

8.      In the 1990s, however, MBIA deviated from its tried and tested business model by seeking growth through the development of a structured finance business portfolio.  In 1998, for example, the Company acquired a firm that specialized in guaranteeing structured securities, primarily asset-backed.  Enticed by the prospects of greater profits, MBIA undertook even greater risks by expanding the business to guarantee untested collateralized debt obligations ("CDOs").[1]  The Company nonetheless maintained its historically low loss reserves.  Indeed, since 2002, MBIA has calculated its provision for the unallocated loss reserve as *only 12 percent* of scheduled net earned premium.

9.      On December 19, 2007, after the close of the markets, MBIA disclosed *for the first time* that it faced significant exposure from guaranteeing the most perilous of CDOs, thereby compromising the all important "AAA" ratings of its claim-paying resources.  In a press release posted on the Company's website, MBIA disclosed that it faced $8.1 billion of exposure from

---

[1] CDOs are pools of bonds, mortgages or other assets repackaged into derivative securities to monetize the income stream generated over time by the underlying assets.

insuring $CDO^2$ Securities (CDOs backed by other CDOs)[2] whose underlying collateral included residential mortgage backed securities ("RMBS"), some of which were categorized as sub-prime.

10.     The marketplace responded to this disclosure with both astonishment and distress. A Morgan Stanley analyst report, for example, referring to the disclosure of the Company's $CDO^2$ Securities exposure, declared that "[w]e are shocked that management withheld this information for as long as it did" and that "[t]his new disclosure completely changes our view of MBIA being a 'more conservative underwriter'" relative to Ambac, the second-largest bond insurer."

11.     Throughout the deepening of the credit and housing crisis, investors have been besieged by eleventh-hour disclosures from financial institutions about the extent of their previously undisclosed CDO and sub-prime exposure, along with correlative billion dollar write-downs and increases of loss reserves. MBIA's revelations are no less disturbing. A December 20, 2007 Reuters article reporting on the Company's disclosure read: "MBIA, the world's largest bond insurer, said it has exposure to $30.6 billion in complex mortgage securities that it insures, *an amount that eclipses its entire net worth*." (Emphasis added.)

12.     On January 9, 2008, MBIA revealed that its exposure to $CDO^2$ Securities was $9 billion, rather than the $8.1 billion previously disclosed, and that almost 60 percent of these $CDO^2$ securities *were originated in 2006 or after*. On the same day, the Associated Press reported in an article entitled *Regulators Probe MBIA Deal, Disclosures*, that the SEC and New

---

[2] $CDO^2$ Securities are considered among the most unsafe of derivative securities because assets underlying the CDO include tranches of other CDOs. As a consequence, an insurer has little or no ability to assess the adequacy of the underlying collateral and other default risk metrics.

York Department of Insurance "have requested information into how MBIA Inc. communicated to investors the risks the bond insurer faced on insured mortgage debt."

13.    On January 23, 2008, Bloomberg reported in an article titled *Massachusetts Investigates Ambac, MBIA CDO Guarantees*, that Massachusetts regulators are investigating whether MBIA "failed to disclose their guarantees of troubled structure financed investments to issuers of municipal bonds in the state." The article continues:

> Secretary of State William Galvin said today he subpoenaed all documents related to municipal bonds the companies insured in Massachusetts since January 2006. ...
>
> ...
>
> "This office wants to know when and if MBIA and Ambac disclosed to bond issuers that their financial condition as an insurer was being severely impacted as a result of their involvement with these highly risky securities," Galvin said in a press release. "In addition, were the risks properly disclosed to investors in the bonds?"
>
> The companies have until Feb. 1 to submit the documents.
>
> *Both Ambac and MBIA are projected to suffer billions of dollars in losses outside of their municipal-bond insurance business because of their expansion into guaranteeing structured investments such as collateralized debt obligations.* (Emphasis added.)

14.    On January 24, 2008, the Financial Times reported in an article titled *Banks pressed to bail-out bond insurers*, that New York State insurance regulators fearing the failure of MBIA and its competitor Ambac are seeking a Wall Street bail-out. The article provides, in relevant part, as follows:

> Leading US banks are under pressure from New York state's insurance regulator to provide as much as $15bn to support struggling bond insurers, people familiar with the matter said on Wednesday night.
>
> Eric Dinallo, New York insurance superintendent, held a two-hour meeting with bank executives on Wednesday and urged them to

provide as much as $5bn in initial capital to support the insurers – the largest of which are MBIA and Ambac – and ultimately to commit up to $15bn.

There is widespread concern that rating agency downgrades of the specialist insurers known as monolines could force a fresh round of writedowns by banks, which could damage already battered investor confidence. This has led to speculation that banks would band together to prop up the insurers, which guarantee payments on thousands of billions of dollars worth of bonds issued by municipal governments and other borrowers. A spokesman for Mr. Dinallo had no comment on details of the meeting.

People familiar with the matter said the specifics of a possible capital infusion had yet to be decided, but contributions would not necessarily be based on how much exposure each bank has to bond insurers.

Some participants in the meeting described the discussions as at an early stage.

15.    Later in the day Reuters quoted Mr. Dinallo in a statement to the press that "Any plan to fix the bond insurers' difficulties will take 'some time,' because of the complexity of the issues and the number of parties involved."

16.    MBIA's situation continued to deteriorate. On January 31, 2008, the Company issued a startling statement: MBIA reported a $2.3 billion loss for the fourth quarter, due mainly to declines in values of securities it insures. It said it incurred losses of $714 million on securities backed by mortgages. Disturbingly, the $714 million loss was nearly as much as the Company paid out in claims over its entire 36-year history - $920 million, according to a report published in the February 1, 2008, edition of The Wall Street Journal.

17.    The Journal further reported that high ranking executives at the Company were aware of the looming crisis since as early as mid-2007, if not sooner. As reported by the Journal:

In the first half of 2007, evidence began trickling out around the nation of rising mortgage defaults. Executives at MBIA's headquarters in Armonk, N.Y., soon started noticing deterioration

in the performance of some of the mortgage-related bonds it insured, according to Mr. Dunton, the chief executive.

Executives pored over the details of the mortgage portfolios. What they found was alarming. "A modest tremor in the residential mortgage markets by November erupted into a full-blown seismic upheaval," Mr. Dunton said on yesterday's conference call.

18.     The day ended with an additional blow to the Company.  Standard & Poor's said late Thursday that it put MBIA Inc. ratings on CreditWatch with negative implications.  In short, this means the agency could downgrade MBIA's crucial "AAA" ratings within 90 days. "Although MBIA has succeeded in accessing $1.5 billion of additional capital, the magnitude of projected losses underscores our view that time is of the essence in the completion of capital-raising efforts," Dick Smith, an analyst at S&P, wrote in a statement.

19.     On February 8, 2008, Bloomberg reported in an article titled *MBIA Raises $1 Billion at a Discount to Lure Buyers*, that the Company sold $1 billion in MBIA Stock at below-market prices to lure buyers and to try to shore up capital to maintain its AAA ratings.  The MBIA Stock was sold at $12.15 per share, 14 percent less than the February 7, 2008 closing price of $14.20.

20.     Defendants are liable to the Company for:

a.      Abandoning and abdicating their responsibilities and fiduciary duties with regard to prudently managing the assets and business of MBIA in a manner consistent with the operations of a publicly held corporation;

b.      Failing to properly oversee or implement policies, procedures, and rules to ensure compliance with federal and state laws requiring the dissemination of accurate financial statements;

c.      Causing and permitting the Company to improperly misrepresent the Company's business prospects and financial results, which misrepresentations include the

following material facts: (i) conceal the fact that the Company was improperly misrepresenting its business prospects with respect to its exposure to CDO$^2$ Securities; and (ii) deceive the investing public, including the Company's shareholders, regarding their management of the Company's operations, financial health and stability, as well as its future business prospects;

        d.      Exposing the Company to liability for violations of federal law; and

        e.      Causing the Company to be a target of regulatory investigations by the Massachusetts Secretary of State and the SEC.

## THE PARTIES

### Plaintiff

21.    Plaintiff Trustees of the Police and Fire Retirement System of the City of Detroit, is, and at all relevant times, was the owner of shares of MBIA Stock. Plaintiff is located in Detroit, Michigan.

### Nominal Defendant

22.    Nominal defendant MBIA Inc. is a Connecticut corporation with its principal executive offices located in Armonk, New York.

### Defendants

23.    The following defendants were and are members of MBIA's Board of Directors and senior management team during the Relevant Time Period.

24.    Defendant David C. Clapp ("Clapp") has served as a member of the Board of Directors since 1994. Clapp also serves as a member of the Company's Executive and Nominating / Corporate Governance Committees. During the Relevant Time Period, Clapp participated in the issuance of materially misleading statements, including the preparation of certain press releases and SEC filings, and was quoted in and approved the issuance of the

Company's false and misleading statements made to the press, securities analysts and MBIA's shareholders.

25.     Defendant Gary C. Dunton ("Dunton") is MBIA's President, Chief Executive Officer ("CEO") and Chairman of its Board of Directors. Dunton was elected Chairman in May 2007, and has served as a member from 1996 until 1998, and rejoining in 1999.  Dunton is also the Chairperson of the Company's Executive Committee.  During the Relevant Time Period, Dunton participated in the issuance of materially misleading statements, including the preparation of certain press releases and SEC filings, and was quoted in and approved the issuance of the Company's false and misleading statements made to the press, securities analysts and MBIA's shareholders.

26.     Defendant Claire L. Gaudiani ("Gaudiani") has served as a member of the Board of Directors since 1992.  Gaudiani is the Chairperson of the Company's Nominating / Corporate Governance Committee, and serves as a member of the Compensation and Organization Committee.  During the Relevant Time Period, Gaudiani participated in the issuance of materially misleading statements, including the preparation of certain press releases and SEC filings, and was quoted in and approved the issuance of the Company's false and misleading statements made to the press, securities analysts and MBIA's shareholders.

27.     Defendant Daniel P. Kearney ("Kearney") has served as a member of the Board of Directors since 1992.  Kearney is the Chairperson of the Company's Compensation and Organization Committee, and serves as a member of the Credit Risk, Executive and Nominating / Corporate Governance Committees.  During the Relevant Time Period, Kearney participated in the issuance of materially misleading statements, including the preparation of certain press

releases and SEC filings, and was quoted in and approved the issuance of the Company's false and misleading statements made to the press, securities analysts and MBIA's shareholders.

28.     Defendant Laurence Meyer ("Meyer") has served as a member of the Board of Directors since 2004. Meyer is the Chairperson of the Company's Credit Risk Committee, and serves as a member of the Company's Executive and Finance Committees. During the Relevant Time Period, Meyer participated in the issuance of materially misleading statements, including the preparation of certain press releases and SEC filings, and was quoted in and approved the issuance of the Company's false and misleading statements made to the press, securities analysts and MBIA's shareholders.

29.     Defendant David M. Moffett ("Moffett") has served as a member of the Board of Directors since 2007. Moffett is the Chairperson of the Company's Audit Committee, and serves as a member of the Credit Committee. During the Relevant Time Period, Moffett participated in the issuance of materially misleading statements, including the preparation of certain press releases and SEC filings, and was quoted in and approved the issuance of the Company's false and misleading statements made to the press, securities analysts and MBIA's shareholders.

30.     Defendant Debra J. Perry ("Perry") has served as a member of the Board of Directors since 2004. Perry also serves as a member of the Company's Audit, Credit Risk and Finance Committees. During the Relevant Time Period, Perry participated in the issuance of materially misleading statements, including the preparation of certain press releases and SEC filings, and was quoted in and approved the issuance of the Company's false and misleading statements made to the press, securities analysts and MBIA's shareholders.

31.     Defendant John A. Rolls ("Rolls") has served as a member of the Board of Directors since 1995. Rolls is the Chairperson of the Company's Finance Committee, and serves

as a member of the Audit and Compensation and Organization Committees.  During the Relevant Time Period, Rolls participated in the issuance of materially misleading statements, including the preparation of certain press releases and SEC filings, and was quoted in and approved the issuance of the Company's false and misleading statements made to the press, securities analysts and MBIA's shareholders.

32.     Defendant Robert C. Vaughan ("Vaughan") has served as a member of the Board of Directors since 2007.  Vaughan also serves as a member of the Company's Audit and Compensation and organization Committees.  During the Relevant Time Period, Vaughan participated in the issuance of materially misleading statements, including the preparation of certain press releases and SEC filings, and was quoted in and approved the issuance of the Company's false and misleading statements made to the press, securities analysts and MBIA's shareholders.

33.     Defendant Robert H. Walker ("Walker") has served as a member of the Board of Directors since 2006.  Walker also serves as a member of the Company's Finance and Nominating / Corporate Governance Committees.  During the Relevant Time Period, Walker participated in the issuance of materially misleading statements, including the preparation of certain press releases and SEC filings, and was quoted in and approved the issuance of the Company's false and misleading statements made to the press, securities analysts and MBIA's shareholders.

34.     Defendant Jeffrey W. Yabuki ("Yabuki") has served as a member of the Board of Directors since 2005.  Yabuki also serves as a member of the Company's Audit and Compensation and Organization Committees.  During the Relevant Time Period, Yabuki participated in the issuance of materially misleading statements, including the preparation of

certain press releases and SEC filings, and was quoted in and approved the issuance of the Company's false and misleading statements made to the press, securities analysts and MBIA's shareholders.

35.     Because of their positions with the Company and substantial ownership of MBIA Stock, defendants Clapp, Dunton, Gaudiani, Kearney, Meyer, Moffett, Perry, Rolls, Vaughan, Walker and Yabuki had the power and authority to cause, and did cause, MBIA to engage in the wrongful conduct complained of herein.  These same defendants had the power and authority to control the contents of the Company's public statements to the financial marketplace, including the false press releases and SEC filings discussed herein.

36.     Defendants Clapp, Dunton, Gaudiani, Kearney, Meyer, Moffett, Perry, Rolls, Vaughan, Walker and Yabuki are sometimes collectively referred to as the "Director Defendants".

37.     Director Defendants engaged in an effort to defraud MBIA and the Company's shareholders by materially inflating the financial results of the Company, failing to disclose the nature of the risks in its insured portfolio and covering up the wrongdoing.

38.     Substantial acts in furtherance thereof took place including the dissemination of materially false and misleading information in public filings including the Company's Form 10-Qs and Form 10-Ks and various press releases (collectively "public filings").

39.     All the natural person defendants upon who substantive relief is requested herein, including the Director Defendants, are sometimes referred to collectively as "Defendants." Defendants are jointly and severally liable for damages as demanded herein.

40.     By reason of their positions at MBIA, each of the Defendants named in this Complaint had access to internal Company documents, reports and other information, including

adverse non-public information about its business, financial condition and future prospects, and attended management and/or board of directors meetings. As a result, they were responsible for the truthfulness and accuracy of the Company's public reports, statements and releases.

41.     By virtue of their high-level positions at MBIA, each of the Defendants directly participated in the management and/or oversight of the Company and was privy to confidential, proprietary information about the Company's business operations and accounting practices. They were involved or participated in drafting, producing, reviewing, approving and/or disseminating the false and misleading statements alleged in this Complaint and were thus aware that the statements were being made, and approved and ratified them in violation of the federal securities laws.

### DUTIES OF DEFENDANTS

42.     Because of their positions as officers, directors and/or fiduciaries of MBIA and because of their ability to control the business and corporate affairs of MBIA, Defendants owed MBIA and its shareholders fiduciary obligations of trust, loyalty, good faith, disclosure and due care, and were and are required to use their utmost ability to control and manage MBIA in a fair, honest and equitable manner. Defendants were and are required to act in furtherance of the best interests of MBIA and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

43.     Each Defendant owes the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue,

margins, operations, performance, management, projections and forecasts so that the market price of the Company's Stock would be based on truthful and accurate information.

44.    Defendants, because of their positions of control and authority as directors and/or officers of MBIA, had the power and authority to cause, and did cause, directly and/or indirectly, MBIA to engage in the wrongful conduct complained of herein.

45.    By reason of their positions at MBIA, each of the Defendants had the power and authority to control the contents of the Company's public statements to the financial marketplace, including the Company's false press releases and SEC filings discussed herein.

46.    Each of the Defendants, because of their advisory, executive, managerial and directorial positions with MBIA, had access to adverse nonpublic information about the financial condition, operations and improper representations of MBIA, access to internal Company documents, reports and other information, including adverse non-public information about its business, financial condition and future prospects, and attended management and/or board of directors meetings.  As a result, they were responsible for the truthfulness and accuracy of the Company's public reports, statements and releases.

47.    By virtue of their high-level positions at MBIA, each of the Defendants directly participated in the management and/or oversight of the Company and was privy to confidential, proprietary information about the Company's business operations and accounting practices. They were involved or participated in drafting, producing, reviewing, approving and/or disseminating the false and misleading statements alleged in the Complaint and were thus aware that the statements were being made, and approved and ratified them in violation of the federal securities laws.

## JURISDICTION AND VENUE

48.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a) because the derivative plaintiffs and defendants are citizens of different states and the matter in controversy exceeds $75,000.  This action is not a collusive action designed to confer jurisdiction on a Court of the United States that it would not otherwise have.  This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

49.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a) and 1391(b) because nominal defendant MBIA is headquartered in this District, and a substantial portion of the transactions and wrongs complained of herein occurred in this District.

50.     Additionally, there is another suits already pending in this District in which MBIA and some or most of the individual defendants in this action are named as defendants, and, thus, discovery and pretrial proceedings can be coordinated in this District.

## SUBSTANTIVE ALLEGATIONS

**MBIA's Core Business**

51.     MBIA is the largest monoline guarantee insurer with a total net insurance in force as of December 31, 2006 of $940 billion.

52.     MBIA's core business is to provide financial guarantee products for municipal bonds sold in the new issue and secondary markets.  Those products provide "an unconditional and irrevocable guarantee of the payment of the principal of, and interest or other amounts owing on, insured obligations when due …."  Municipal bonds wrapped by MBIA's financial guarantee allow the bonds to be sold based upon the Company's AAA rating, thus lowering the municipality's interest expense.  In short, MBIA's guarantee saves the issuer money.

53.     Since MBIA effectively sells its own AAA rating, the Company's AAA ratings are essential to its continued business and success of guaranteeing both municipal bond and structured finance issuances.

54.     Rating agencies are primarily concerned with the Company's capital cushion – the ability to pay claims when necessary.  In assessing capital adequacy, reports of loss reserves and of exposure to especially risky insured products are particularly important to the rating agencies and the investing community.  Thus, a sharp increase in losses beyond reserves would threaten MBIA's capital cushion and jeopardize its coveted AAA rating.

55.     During the Relevant Time Period, the Company's annual returns disclosed to shareholders that loss reserves for obligations the MBIA guarantees are established as follows:

Loss and loss adjustment expense ("LAE") reserves are established by the Company's Loss Reserve Committee, which consists of members of senior management, and require the use of judgment and estimates with respect to the occurrence, timing and amount of a loss on an insured obligation.

The Company establishes two types of loss and LAE reserves for non-derivative financial guarantees: an unallocated loss reserve and case basis reserves.  The unallocated loss reserve is established with respect to the Company's entire non-derivative insured portfolio.  *The Company's unallocated loss reserve represents the Company's estimate of losses that have or are probable to occur as a result of credit deterioration in the Company's insured portfolio but which have not yet been specifically identified and applied to specific insured obligations.*

Each quarter the Company calculates its provision for the unallocated loss reserve as a fixed percent of scheduled net earned premium.  Annually, the Loss Reserve Committee evaluates the appropriateness of this fixed percent loss factor.  In performing this evaluation, the Loss Reserve Committee considers the composition of the Company's insured portfolio by municipal sector, structured asset class, remaining maturity and credit quality, along with the latest industry data, including historical default and recovery experience for the relevant sectors of the fixed-income market in order to determine if a trend is developing that indicates the loss factor should be increased or decreased.  In addition, the Company

considers its own historical loss activity and how those losses develop over time.  The Loss Reserve Committee reviews the results of its annual evaluation over a period of several years to determine whether any long-term trends are developing. Therefore, case basis reserves established in any year may be above or below the loss factor without requiring an increase or decrease to the loss factor.  The Company's additions to specific case basis reserves in the years ended December 31, 2005 and 2004 exceeded the 12% loss factor currently used by the Company. However, additions to specific case basis reserves in the year ended December 31, 2006 were less than the 12% loss factor.  The Loss Reserve Committee is continuing to monitor any trends and evaluate whether an adjustment to the Company's current loss factor is appropriate.  However, if a catastrophic or very unusual loss occurred, the Loss Reserve Committee would consider taking an immediate charge through "Losses and loss adjustment expenses" and possibly also increasing the loss factor in order to maintain an adequate level of loss reserves.  *Since 2002, the Company has calculated its provision for the unallocated loss reserve as 12% of scheduled net earned premium.*  (Emphasis added.)

56.     MBIA historically, as well as during the Relevant Time Period, maintained low reserves.  In the Form 10-K for year ended fiscal year December 31, 2005, filed March 8, 2006, MBIA reported loss reserves of $772 million on its outstanding net debt service insured of $889 billion.  In the Form 10-K for year ended fiscal year December 31, 2006, filed February 15, 2007, MBIA reported loss reserves of $537 million on its outstanding net debt service insured of $940 billion.  In both of the filings the Company stated: "*we believe that these reserves are adequate to cover ultimate net losses.*"  (Emphasis added.)

**MBIA Materially Changes Its Core
Business Model to Improve Profit Margins**

57.     In the mid 1990s, MBIA began to aggressively pursue increased profits, moving away from the steady, yet conservative municipal bond guarantee business model and toward structured finance.  The Company's move was spurred largely through its half a billion dollar acquisition of CapMAC Holdings Inc. ("CapMAC") in 1998.  CapMAC specialized in insuring

structured finance securities, most of which were asset-backed. This provided MBIA access to a pool of new customers seeking to be wrapped by its coveted AAA ratings. By year end 2006, structured finance written premiums comprised 32 percent of its business.

58.    As the prevalence of CDOs in the structured finance markets grew, so did the opportunities for MBIA along with risks. Management, however, assured shareholders that the Company's underwriting standards and pricing of premiums to guarantee these derivatives were sound.

59.    On February 9, 2006, MBIA issued a press release announcing the results of operations for year ended December 31, 2005. Commenting on the results Defendant Dunton stated:

> We achieved acceptable operating financial results in a challenging marketplace, one in which we saw intense competition, tight credit spreads and investors awash in capital.    Despite fewer opportunities in international public finance, business production in our other sectors was good, and very strong in the case of international structured finance.
>
> Looking ahead, given our expectation that current market conditions will persist, it is unlikely that we will achieve our historical growth rates in 2006. *Our underwriting standards and pricing discipline are designed for long-term profitability, and we simply won't compromise them for short-term gain. Our franchise remains solid, and our commitment to building long-term shareholder value is steadfast.* (Emphasis added.)

60.    With respect to the Company's loss reserve and overall credit quality, the press release provided, in relevant part:

> The Company incurred $84.3 million in loss and loss adjustment expenses in 2005, a 1 percent decrease compared to $84.8 million in 2004.   Total case-incurred activity was $188.6 million in 2005, primarily related to transactions in the Enhanced Equipment Trust Certificate (EETC), CDO, tax lien, mortgage-backed, and manufactured housing sectors, as well as accretion on reserves previously established for the Company's AHERF exposure. The

unallocated loss reserve as of December 31, 2005 stands at $208.6 million.

...

*Overall credit quality in the insured portfolio improved this year, with 81 percent of the total book of business rated A or better, up from 80 percent at the end of 2004.* The percentage of the portfolio rated non-investment grade increased somewhat to 2.1 percent, up from 1.9 percent in 2004, driven by the addition of two consumer asset-backed financings. (Emphasis added.)

61.     Notwithstanding the promise of strict underwriting standards, pricing discipline and commitment to building long-term shareholder value, MBIA possessed limited experience with the guaranteeing of CDO issuances, and even less with CDOs comprised of RMBS. As such, the Company was wholly unable to model dislocations in the marketplace to reasonably predict its potential exposures. Yet, the Company's exposure to these derivatives securities ballooned to meet its appetite for greater profit margins.

62.     On January 30, 2007, MBIA issued a press release announcing the results of operations for year ended December 31, 2006 results. With respect to the Company's results Defendant Dunton said:

We achieved acceptable financial and operating results despite a challenging market environment with strong competitive pressures. Business production was robust for the fourth quarter, where we recorded our highest quarterly adjusted direct premium in three years. Additionally, our asset management business had a strong year. *We remain committed to pursuing only those business opportunities that meet our strict underwriting and return standards.* (Emphasis added.)

63.     The press release, in relevant part, provided the following in regard to the Company's loss reserves and overall credit quality of its insured portfolio:

The Company incurred $80.9 million in loss and loss adjustment expenses in 2006, a 4 percent decrease compared to $84.3 million in 2005. Loss and LAE for both periods is based on the Company's formula of reserving 12 percent of scheduled premiums

earned. *During 2006, the net effect of MBIA's formula-based loss reserving combined with case loss reserve activity resulted in a $4.7 million increase to its unallocated loss reserve, increasing the Company's unallocated loss reserve to $213.3 million at December 31, 2006. ...*

...

*Overall credit quality in the insured portfolio remained high, with 81 percent of the total book of business rated A or better, unchanged from the end of 2005.* The percentage of the portfolio rated non-investment grade decreased to 1.9 percent from 2.1 percent in 2005, with about half of the reduction resulting from a decrease in the par amount of non-investment grade rated credits and the other half resulting from the growth of the outstanding book of business.

64.     On April 26, 2007, MBIA issued a press release announcing the results of operations for the quarter ended March 31, 2007. In connection with the press release, Defendant Dunton said:

> We were pleased with solid new business production in our insurance segment during the first quarter. Although narrow spreads continue to challenge the market, the pipeline of deals is encouraging as spreads widen in some sectors. In addition, we strengthened our back book of business through successful remediations, and our investment management business continued its steady growth in assets under management. *We remain committed to our rigorous risk management practices with the goal of building shareholder value for the long term.* (Emphasis added.)

65.     The press release further disclosed:

> Business production in U.S. structured finance also grew sharply, with significant contributions from CDOs and mortgage-backed securities asset classes. *The CDOs included investment grade corporate CDOs, as well as multi-sector transactions. MBIA's insurance policies attached at either Triple-A or super Triple-A ratings for all of the CDOs insured in the quarter. All multi-sector CDO deals had super Triple-A underlying ratings, where MBIA's insurance typically attached at two times the base Triple-A rating.* These deals are managed portfolios and the Company's credit analysts review each piece of collateral that is included in the transaction.

> *While the Company continues to explore opportunities within the subprime mortgage sector, first quarter 2007 subprime mortgage activity was limited to a modest ($59 million net par) secondary market transaction that was rated Triple-A prior to MBIA's insurance.* All of the other mortgage-backed deals insured in the first quarter were either home equity lines of credit or second mortgage transactions for prime borrowers. Three Countrywide home equity securitizations, totaling $3.3 billion of par value, figured prominently among mortgage-backed activity in the quarter. … (Emphasis added.)

66. With respect to the Company's loss reserve and overall credit quality, the press release provided:

> The Company incurred $20.5 million in loss and loss adjustment expenses (LAE) in the first quarter of 2007, a 2 percent increase compared to $20.1 million in last year's first quarter. Loss and LAE for both periods are based on the Company's formula of reserving 12 percent of scheduled net premiums earned. *During the first quarter of 2007, the net effect of MBIA's formula-based loss reserving and case loss reserve activity resulted in a $13.5 million decrease to its unallocated loss reserve. The Company's unallocated loss reserve was $199.9 million at March 31, 2007.*
>
> …
>
> *The overall credit quality in the insured portfolio remained high with 82 percent of the total book of business rated A or better compared with 81 percent in the first quarter of 2006.* The percentage of the portfolio rated below-investment trade decreased to 1.9 percent from 2.1 percent in the same period-end last year. (Emphasis added.)

67. Throughout the summer of 2007, concerns mounted in the financial industry over dislocations in the credit and housing markets related to "sub-prime" exposures. Apparently in response, the Company convened a "Subprime RMBS Conference Call" on August 2, 2007. The purported purpose of the conference call was to respond to "questions concerning MBIA's sub-prime RMBS exposure, CDO exposure and related topics." The supporting materials for the conference call included a presentation titled *MBIA's Selective Approach to Subprime RMBS and Multi-Sector CDOs.*

68.    The presentation represented, *inter alia*, that MBIA's portfolio of multi-sector CDOs with sub-prime exposure totaled $15.9 billion.   Moreover, sub-prime collateral within multi-sector CDOs and direct sub-prime RMBS comprised less than 2 percent of the Company's entire global structured finance portfolio.   The presentation, however, made no mention whether MBIA guaranteed any $CDO^2$ Securities.

69.    During the conference call, one investor specifically inquired whether MBIA possess any exposure to $CDO^2$ Securities.   MBIA Chief Financial Officer ("CFO") Edward Chaplin responded that MBIA had approximately $6.1 billion in net par exposure to $CDO^2$ securities.   The Company did not disclose, however, whether any part of the $CDO^2$ Securities it guaranteed contained RMBS.

70.    On October 25, 2007, MBIA issued a press release announcing the results of operations for the quarter ended September 30, 2007.   Commenting on the results Defendant Dunton stated:

> Spreads widened significantly across the market in the third quarter and caused our insured credit derivatives portfolio to generate a large "mark-to-market" loss, which we do not believe accurately reflects the economics of our business. *The "mark-to-market" loss is not an actual loss, nor is it indicative of future claims. We remain comfortable that our insured credit derivatives portfolio will not result in material credit losses.* More important, wider spreads contributed to a substantially better pricing environment for our insurance and asset/liability management products. *From an Adjusted Direct Premium production standpoint, the third quarter was outstanding - the Company's second best quarter ever and the best quarter for our structured finance business. Pricing was strong across many sectors, and the credit quality of our new business was very high.* (Emphasis added.)

71.    With respect to the Company's loss reserve and overall credit quality, the press release provided:

The Company incurred $63.7 million in loss and loss adjustment expenses (LAE) in the first nine months of 2007, a 5 percent increase over the $60.8 million in last year's first nine months, which corresponds to the growth in scheduled premiums earned. The Company incurred $22.2 million in loss and LAE in the third quarter of 2007 compared with $20.4 million for the prior year's third quarter. Loss and LAE incurred is based on the Company's formula of reserving 12 percent of scheduled premiums earned. *During the third quarter of 2007, the net effect of MBIA's formula-based loss reserving combined with its case loss reserve activity resulted in a $10.5 million increase to its unallocated loss reserve. The Company's unallocated loss reserve was $213.7 million at September 30, 2007, level with $213.3 million at December 31, 2006.*

The overall credit quality of the insured portfolio remained high with 82 percent of the total book of business rated A or better as of September 30, 2007. The percentage of the portfolio rated below investment grade on an S&P priority basis decreased to 1.4 percent as of September 30, 2007 from 2.2 percent as of September 30, 2006. The largest reduction in the below-investment-grade rated portion of the insured portfolio resulted from the retirement of MBIA's $1.6 billion Eurotunnel exposure. (Emphasis added.)

**The Truth of the Company's CDO[2]**
**Securities Exposure is Belatedly Disclosed**

72.     On December 19, 2007, MBIA issued a press release titled *Standard & Poor's Affirms Triple-A Ratings for MBIA Insurance Corporation and Changes Outlook to Negative.* S&P issued a report analyzing MBIA's credit position that resulted in the Company's outlook being cut to negative.

73.     In connection with the press release, Defendant Dunton said:

We are pleased with Standard & Poor's affirmation of our Triple-A ratings as we continue to make progress towards the implementation of a capital management plan during the first quarter of 2008, including the consummation of the Warburg Pincus commitment to invest up to $1 billion that will further enhance our financial resources. While we recognize there is uncertainty in the mortgage and housing markets, we are confident that we will successfully manage through this challenging period, while growing the business profitably, and return to Stable Outlook.

74.     The press release also noted that the Company "supplemented the listing of its exposure to CDOs that include RMBS as of September 30, 2007 to make it consistent with the CDOs that were included in Standard & Poor's analysis and the listing has been posted on its Web site."

75.     After the close of the markets on December 19, 2007, in a press release posted on the Company's website, MBIA disclosed that it faced $8.1 billion of exposure from insuring CDO$^2$ Securities whose underlying collateral included residential mortgage backed securities ("RMBS"), some of which were categorized as sub-prime.

76.     The marketplace responded to this disclosure with both astonishment and distress. On December 20, 2007, a Reuters article titled *MBIA Details Huge Mortgage Exposure*, reported, in relevant part, as follows:

> MBIA Inc (MBI.N:), the world's largest bond insurer, *said it had guaranteed $8.1 billion of the riskiest mortgage securities, imperiling its entire net worth* and sending its shares plunging 26 percent.
>
> The company said it had guaranteed $30.6 billion of complex mortgage securities in total.  The disclosure threatens to set off a chain reaction that could lead to larger write-downs at Wall Street banks.
>
> "*We are shocked that management withheld this information for as long as it did,*" Morgan Stanley said.
>
> "*This new disclosure completely changes our view of MBIA being a 'more conservative underwriter'* relative to Ambac," the second-largest bond insurer, said a Morgan Stanley report co-written by analysts Ken Zerbe and Yoana Koleva.
>
> MBIA's stock fell to a 13-year low on Thursday in its biggest one-day decline ever, bringing its total drop this year to more than 70 percent.  The stock, which closed at $19.95 on Thursday, had hit a record high in January.
>
> The cost to insure MBIA bonds also soared to new records.

*MBIA is most vulnerable to guarantees on $8.1 billion of collateralized debt obligations, or CDOs, most of which includes the riskiest debt known as CDO squared, or CDOs backed by other CDOs.* MBIA detailed its exposures on its Web site late on Wednesday. The company's net worth as of September 30 was $6.5 billion.

The announcement may scuttle MBIA's $1 billion investment from buyout firm Warburg Pincus LLC WP.UL, according to rating firm Egan-Jones Rating Co. Warburg said on December 10 it would initially invest $500 million by purchasing MBIA shares at $31 each, a move that helped restore some investor confidence and had pushed MBIA shares as high as $37.50 the day the deal was announced.

...

*MBIA's CDO exposure is the latest sign that pristine top ratings of bond insurers are in jeopardy of downgrades by rating agencies.*

Triple-A ratings are a core part of the business model for the industry, and lower ratings may cause a ripple effect that forces more Wall Street banks to take billions of dollars of losses on the insured securities.

Rating agencies this year have slashed their ratings on billions of dollars worth of mortgage-linked securities as U.S. homeowners have defaulted on their payments.

Fitch said on Thursday it also may cut MBIA's ratings due to its exposure to the mortgage securities.

...

Credit protection costs on MBIA through credit default swaps surged 100 basis points, an investor said. The cost of protecting MBIA's debt rose to a record 600 basis points, or $600,000 a year for five years to protect $10 million of debt.

77.     On December 21, 2007, MBIA issued a press release titled *Fitch Places MBIA on Rating Watch Negative Pending MBIA Raising Additional Capital; Says it Anticipates Affirming MBIA's Ratings with Stable Outlook if Additional Capital is Raised Within 4-6 Weeks.* The press release provided:

MBIA Inc. (NYSE: MBI) Fitch Ratings yesterday announced that, pending MBIA's raising additional capital, it had placed the AA ratings of MBIA Inc. and AAA ratings of MBIA Insurance Corporation and its subsidiaries on Rating Watch Negative. In its press release, Fitch indicated that MBIA has a shortfall of approximately $1 billion and stated that, "If at any time during the next four-to-six weeks, MBIA is able to obtain capital commitments and/or put in place reinsurance or other risk mitigation measures, on top of the $1 billion capital commitment the company received from Warburg Pincus, that would help improve MBIA's Matrix result at an 'AAA' rating stress, Fitch would anticipate affirming MBIA's ratings with a Stable Rating Outlook." Fitch also noted that if MBIA is unable to obtain capital commitments or put into place reinsurance or other risk mitigation measures to address its capital shortfall in the noted timeframe, Fitch would expect to downgrade MBIA's IFS ratings by one notch to 'AA+'.

Gary Dunton, Chairman and Chief Executive Officer stated, "We continue to make steady progress with the implementation of the remaining components of the capital plan presented to Fitch, and we are confident that we will be able to satisfy the criteria in a timely manner to ensure that our Stable Rating Outlook is restored to our Triple-A ratings."

The Company previously announced a commitment by Warburg Pincus to invest $1 billion in MBIA's common stock and anticipates that the transaction will close in a timely manner.

78.     On January 9, 2008, the Company filed a Form 8-K which disclosed, *inter alia*:

*The Company has recently had discussions with and has provided information on a voluntary basis to the New York Insurance Department ("Department") and the Securities and Exchange Commission ("SEC") in response to informal inquiries with respect to certain matters, including the Warburg Pincus transaction, the Company's announcement of preliminary loss reserve estimates on December 10, 2007 related to MBIA's residential mortgage-backed securities exposure and disclosures regarding MBIA's CDO exposure. The Company may receive additional inquiries from and may provide additional information to these agencies in response to any inquiries with respect to these or other matters in the future.* In addition, in connection with its discussions with the Department, MBIA committed to provide the Department with advance notice of certain matters such as the payment of dividends, MBIA's approach to its structured finance business and significant transactions that are not in the ordinary

course of business and to continue to discuss such matters with the Department. (Emphasis added.)

79.     This Form 8-K filing also disclosed that MBIA "revised certain risk factors it previously disclosed in its Form 10-K for the year ended December 31, 2006," further confirming that such prior disclosures to shareholder were materially false and misleading. The revised risk factors (with modifications from the prior underscored) are as follows:

> **A reduction in MBIA's financial strength ratings from any of the major rating agencies would materially and adversely affect our financial condition, results of operations and future business**
>
> MBIA's ability to attract new business and to compete with other triple-A rated financial guarantors is largely dependent on the triple-A financial strength ratings assigned to it by the major rating agencies and the financial enhancement rating assigned by S&P. MBIA intends to comply with the requirements imposed by the rating agencies to maintain such ratings; however, no assurance can be given that MBIA will successfully comply with these requirements, that these requirements will not change or that, even if MBIA complies with these requirements, one or more of such rating agencies will not lower or withdraw its financial strength ratings of MBIA or place MBIA on "negative outlook" or "rating watch negative" status indicating that a downgrade may be considered in the future. On December 14, 2007, Moody's changed MBIA's outlook to "negative" from "stable," while confirming the outlook of three of MBIA's competitors as "stable," on December 19, 2007, S&P changed MBIA's outlook to "negative" from "stable" while confirming the outlook of two of MBIA's competitors as "stable" and on December 20, 2007, Fitch placed MBIA Inc. and MBIA on rating watch negative. MBIA's ability to attract new business and to compete with other triple-A rated financial guarantors, and its results of operations and financial condition, would be materially adversely affected by any reduction, or suggested possibility of reduction, in its ratings.
>
> Requirements imposed by the rating agencies to maintain our triple-A rating are outside of our control, and such requirements oblige us to raise additional capital or take other remedial actions in a relatively short timeframe. We are implementing a capital plan in order to raise sufficient funds to meet the rating agency capital requirements to maintain our triple-A rating and obtain a "stable" outlook from S&P, Moody's and Fitch. The capital plan

consists of the previously announced Warburg Pincus investment, indebtedness, and capital formation and risk reduction from operations. However, there can be no assurance that we will successfully complete all or any of these transactions, and there can be no assurance that the rating agencies, in particular S&P, will change our outlook to "stable" even if we successfully implement our capital plan. The Warburg Pincus investment is subject to closing conditions, including performance of specified covenants, receipt of Hart-Scott-Rodino approval, as well as the approvals of the various regulatory authorities (including insurance regulatory approvals in New York, Illinois and the United Kingdom), and the absence of any injunction or other legal prohibition on closing. Each element of the capital plan is subject to conditions and delays, during which new economic developments could adversely affect rating agency capital requirements or our ability to successfully implement the capital plan. If we are unable to successfully implement all or any portion of the capital plan, our financial strength ratings may be downgraded, which would materially adversely affect our financial condition, results of operations and future business.

**Recent adverse developments in the credit markets and any potential negative impact on MBIA's insured portfolio may materially and adversely affect our financial condition, results of operations and future business**

MBIA is exposed to credit risks in its portfolio that may arise from deterioration in the credit markets, wherein such deterioration in credit performance could lead to potential erosion in the quality of assets and also the collection of cash flows from such assets within structured securities that it has guaranteed. While MBIA has sought to underwrite direct residential mortgage-backed securities ("RMBS"), structured pools of commercial mortgage-backed securities ("CMBS") and collateralized debt obligations ("CDOs") of asset-backed securities ("ABS") with levels of subordination and other credit enhancements designed to protect it from loss in the event of poor performance on the underlying assets collateralizing the securities in the insured portfolio, as of January 8, 2008, we estimated that we would establish loss case basis loss reserves of $614 million under GAAP and $814 million under SAP and a special increase to unallocated loss reserves of $100 million under GAAP due to projected inadequacies of such credit enhancements in securities it has guaranteed. The special increase to unallocated loss reserve is in addition to MBIA's regular quarterly addition of 12% of scheduled earned premiums, or approximately $23 million in the fourth quarter of 2007. We expect the after-tax effect of the establishment of such SAP

reserves to eliminate MBIA's net income and produce a loss for the fourth quarter and possibly for 2007 under SAP. No assurance can be given that such credit enhancements will prove to be adequate to protect MBIA from incurring additional material losses in view of the current significantly higher rates of delinquency, foreclosure and loss rates being observed among residential homeowners. The extent and duration of any future continued deterioration of the credit markets is unknown, as is the impact, if any, on potential claim payments and ultimate losses of the securities within MBIA's portfolios. In addition, there can be no assurance that any of the governmental or private sector initiatives designed to address such credit deterioration in the markets will be implemented, and there is no way to know the effect that any such initiatives could have on the credit performance over time of the actual securities that MBIA insures.

In addition, there can be no assurance that we would be successful, or that we would not be delayed, in enforcing the subordination provisions, credit enhancements or other contractual provisions of the RMBS, CMBS and CDOs of ABS MBIA insures in the event of litigation or the bankruptcy of other transaction parties. Many of the subordination provisions, credit enhancements and other contractual provisions of the RMBS, CMBS and CDOs of ABS MBIA insures are untested in the market and, therefore, it is uncertain how such subordination provisions, credit enhancements and other contractual provisions will be interpreted in the event of an action for enforcement.

Individual credits in MBIA's insured portfolio (including potential new credits) are assessed a rating agency "capital charge" based on a variety of factors, including the nature of the credits, their underlying ratings, their tenor and their expected and actual performance. In the event of an actual or perceived deterioration in creditworthiness, a reduction in the underlying rating or a change in the rating agency capital methodology, MBIA may be required to hold more of its capital in reserve against credits in its insured portfolio, regardless of whether losses actually occur, or against potential new business. Significant reductions in underlying ratings of credits in MBIA's insured portfolio can produce significant increases in assessed "capital charges." There can be no assurance that MBIA's capital position will be adequate to meet such increased reserve requirements or that MBIA will be able to secure additional capital, especially at a time of actual or perceived deterioration in creditworthiness of new or existing credits. Unless MBIA was able to increase its amount of available capital, an increase in capital charges could reduce the amount of capital available to pay claims and support MBIA's triple-A

ratings and could have an adverse effect on MBIA's ability to write new business.

In recent weeks and months Fitch, Moody's and S&P have announced the downgrade of, or other negative ratings actions with respect to, a large number of structured finance transactions, including certain transactions that MBIA insures.  While less than 5% of MBIA's insured portfolio as of September 30, 2007 has been downgraded as of January 8, 2008 in connection with the rating agencies' recent downgrades of structured finance transactions, there can be no assurance that additional securities in MBIA's insured portfolio will not be reviewed and downgraded in the future.  Moreover, we do not know what portion of the securities in MBIA's insured portfolio already have been reviewed by the rating agencies and if, and when, the rating agencies might review additional securities in MBIA's insured portfolio or review again securities that have already been reviewed and/or downgraded.  Downgrades of credits that MBIA insures will result in higher capital charges to MBIA under the relevant rating agency model or models.  If the additional amount of capital required to support such exposures is significant, MBIA could be required to raise additional capital, if available, on terms and conditions that may not be favorable to MBIA, curtail current business writings, or pay to transfer a portion of its in-force business to generate capital for ratings purposes with the goal of maintaining its triple-A ratings.  Among other things, such events or goal may not be obtainable, and such events or actions could adversely affect the results of operations and financial condition of MBIA going forward.

**Loss reserve estimates are subject to uncertainties and loss reserves may not be adequate to cover potential paid claims**

The financial guarantees issued by MBIA insure the financial performance of the obligations guaranteed over an extended period of time, in some cases over 30 years, under policies that MBIA has, in most circumstances, no right to cancel.  As a result of the lack of statistical paid loss data due to the low level of paid claims in MBIA's financial guarantee business and in the financial guarantee industry in general, particularly, until recently, in the structured asset-backed area, MBIA does not use traditional actuarial approaches to determine its loss reserves.  The establishment of the appropriate level of loss reserves is an inherently uncertain process involving numerous estimates and subjective judgments by management, and therefore, there can be no assurance that actual paid claims in MBIA's insured portfolio will not exceed its loss reserves.  Additionally, MBIA uses both